BRONSTER HOSHIBATA
A Law Corporation

MARGERY S. BRONSTER    4750
REX Y. FUJICHAKU          7198
DONNA C. MARRON          9667
1003 Bishop Street, Suite 2300
Honolulu, Hawai‘i  96813
Telephone: (808) 524-5644
Facsimile:  (808) 599-1881
E-mail: mbronster@bhhawaii.net
         rfujichaku@bhhawaii.net
         dmarron@bhhawaii.net

Attorneys for Plaintiffs
ROBERT ITO FARM, INC.;
HAWAII FARM BUREAU
FEDERATION, MAUI COUNTY;
MOLOKAI CHAMBER OF
COMMERCE; and
AGRIGENETICS, INC.

ALSTON HUNT FLOYD & ING
A Law Corporation

KENNETH S. ROBBINS        1000
PAUL ALSTON                1126
J. BLAINE ROGERS           8606
NICKOLAS A. KACPROWSKI   8627
MICHELLE N. COMEAU         9550
1001 Bishop Street, Suite 1800
Honolulu, Hawai‘i  96813
Telephone:  (808) 524-1800
Facsimile:  (808) 524-4591
E-mail: krobbins@ahfi.com
         palston@ahfi.com
         jrogers@ahfi.com
         nkacprowski@ahfi.com
         mcomeau@ahfi.com

PHILIP PERRY
(pro hac vice pending)
ANDREW D. PRINS
(pro hac vice pending)
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C.  20004-1304
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
E-mail:  philip.perry@lw.com
          andrew.prins@lw.com

Attorneys for Plaintiffs
MONSANTO COMPANY;
CONCERNED CITIZENS OF
MOLOKAI AND MAUI; FRIENDLY
ISLE AUTO PARTS & SUPPLIES,
INC.; NEW HORIZON
ENTERPRISES, INC. dba MAKOA
TRUCKING AND SERVICES and
HIKIOLA COOPERATIVE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ROBERT ITO FARM, INC.; HAWAII FARM BUREAU FEDERATION, MAUI COUNTY; MOLOKAI CHAMBER OF COMMERCE; MONSANTO COMPANY; AGRIGENETICS, INC.; CONCERNED CITIZENS OF MOLOKAI AND MAUI; FRIENDLY ISLE AUTO PARTS & SUPPLIES, INC.; NEW HORIZON ENTERPRISES, INC. dba MAKOA TRUCKING AND SERVICES; and HIKIOLA COOPERATIVE,<br><br>       Plaintiffs,<br><br>   vs.<br><br>   COUNTY OF MAUI,<br><br>       Defendant. | CIV. NO. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; EXHIBIT "A"** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### PRELIMINARY STATEMENT

1.   Impacted agricultural workers, farmers, community businesses, concerned citizens, a local farmer's cooperative, and the seed companies operating in Maui County bring this action to enjoin and invalidate the County of Maui Ordinance approved by

2

the voters on November 4, 2014 by ballot initiative entitled "A Bill Placing a Moratorium on The Cultivation of Genetically Modified Organisms" (the "Ordinance") (attached as Exhibit "A").   The Ordinance imposes an immediate ban on the new planting and testing of genetically engineered ("GE") crops[1] within the County. Although styled as a "moratorium," the Ordinance is actually a complete ban.  It can be repealed only after at least two years have passed, multimillion dollar studies funded entirely by private agricultural interests are completed, and the County Council makes "findings" about the health, safety, and benefits of specific GE crops.  The ban can only be lifted by a 2/3rds supermajority vote of the County Council.

2.    This ban will cause immediate and traumatic harm to the local economy, and to many individuals who rely on GE crops to support themselves and their families.  It will also irreparably harm seed companies which rely upon the unique climate on Maui and Molokai and the highly specialized capabilities of their local facilities to breed the highest quality and most suitable seed for

---

[1] GE crops are also often referred to as genetically modified organisms ("GMOs").

U.S. and international agriculture.   And, it will render valueless multi-million dollar investments made by seed companies in those facilities.   According to the Maui County Mayor, the job loss and economic dislocation caused by  the ban will "probably bankrupt Molokai,"[2] which  is  precisely  why  the  people  of  Molokai overwhelmingly voted against the Ordinance (63%-to-35%).[3]

3.   The Ordinance violates federal, state and local law, and is predicated on purported "findings" that are directly at odds with decades of settled science and more than one hundred federal agency expert scientific determinations.   Indeed, the Ordinance stands in direct conflict with this Court's recent ruling in *Syngenta Seeds, Inc. v. County of Kaua'i*, No. 14-CV-00014-BMK, 2014 WL 4216022 (D. Haw. Aug. 25, 2014), which holds that only the State and its Department of Agriculture—not individual counties—may regulate in this area.   The Ordinance even violates the County's own Charter and associated state law, by *inter alia*, appropriating money

---

[2] *See* Catherine Cluett, *GE Crop Debate Shakes Molokai*, The Molokai       Dispatch       (Oct.       22,       2014), http://themolokaidispatch.com/ge-crop-debate-shakes-molokai/
[3] *See* Anita Hofschneider, *Majority of Voters on Molokai, Lanai Opposed Maui County GMO Ban*, Civil Beat (Nov. 6, 2014), http://www.civilbeat.com/2014/11/majority-of-voters-on-molokai-lanai-opposed-maui-county-gmo-ban/.

despite an explicit limitation on using the initiative power for that purpose, providing penalties far beyond what the Charter allows, imposing improper constraints on the County Council, supplanting the executive power of the Mayor, and assessing an invalid multimillion dollar tax on agricultural interests. The Ordinance should be immediately enjoined from taking effect, and then invalidated.

## THE PARTIES

4. Plaintiff Robert Ito Farm, Inc. ("Ito") is a local business in Kula, Maui, that has been farming on Maui for 40 years. Ito currently grows and sells GE sweet corn, in addition to conventionally grown vegetables and crops, in the County.

5. Plaintiff Hawaii Farm Bureau Federation, Maui County ("Maui Farm Bureau") is a nonprofit trade organization that operates agricultural tradeshows and fairs, in addition to offering agricultural products and publications in the County. The Maui Farm Bureau currently has 210 members comprised of farmers, ranchers, and supporters and suppliers of farms and ranches, including companies, farmers, and others who currently grow and sell GE crops in the County.

6.    Plaintiff Molokai Chamber of Commerce ("MCC") is a nonprofit corporation that promotes the Molokai businesses community.  It has 25 member businesses, including Monsanto. The majority of the MMC's members derive a large portion of their income from supporting the GE industry.  That income will be lost if there is a ban on GE agriculture.  The proposed ordinance will also impact member businesses that do not directly support the GE industry, as the loss of the GE industry will send a ripple effect through the Molokai economy that will result in lost revenues for Molokai businesses.

7.    Plaintiff Monsanto Company ("Monsanto") is a sustainable agriculture company that develops, among other things, biotechnology traits and seeds for row crops.  Monsanto owns or leases approximately 784 acres of farmland on Maui island and 2,296 acres of farmland on Molokai island, and employs over 365 people in the County.  Monsanto's operations in the County focus primarily on the development of new varieties of genetically engineered corn and soybeans, and the multiplication of seed for commercial sale.  Monsanto has invested tens of millions of dollars in specialized facilities, and its operations in the County are a

critical part of its product development process. Indeed, a significant percentage of corn seed planted in the U.S. have originated from Monsanto's facilities in the County. If the Ordinance is upheld, the principal purpose of Monsanto's local operations will be made illegal. Monsanto will be compelled to substantially downsize its activity in the County, impacting a large portion of its workforce, and take other actions that will cause it substantial and irreparable harm.

8. Plaintiff Agrigenetics, Inc. dba Mycogen Seeds ("Agrigenetics") is an agriculture company that develops, among other things, biotechnology traits and seeds for crops. Agrigenetics farms approximately 420 acres on Molokai, and employs approximately 109 full time, part time and seasonal people in the County. Agrigenetics' operations in the County focus primarily on the development of new varieties of genetically engineered corn, and the multiplication of seed for commercial sale. Agrigenetics purchases most of its farming supplies locally and uses local contractors for many facets of its Molokai operations. Agrigenetics has invested tens of millions of dollars in specialized facilities, and its operations in the County are a critical part of its product

development process. If the Ordinance is upheld, the principal purpose of Agrigenetics' local operations will be made illegal. Agrigenetics will be compelled to shut down critical parts of its development and production operations in the County, substantially downsize its work force and activities in the County, putting many people out of work, and take other actions that will cause it and its employees substantial and irreparable harm.

9. Plaintiff Concerned Citizens of Molokai and Maui ("CCMM") is an organization of over 300 Molokai and Maui residents who support the agricultural industry in Maui County. Most of CCMM's members have spent their entire lives in their communities, and have planned their lives and household economics around the expectation that the GE agriculture industry would continue. Many of CCMM's members have spent their entire working lives with Monsanto and are not well trained or prepared to simply change industries. The proposed ordinance will substantially harm CCMM's interests and CCMM's members. If the GE ban takes effect, almost all of CCMM's members will lose their jobs. It is unlikely that most of these members will find sufficient employment opportunities at any time in the foreseeable future.

The lack of employment prospects is particularly problematic for CCMM's members on the Island of Molokai. Those members have very little chance of finding alternative employment if the GE agriculture industry is banned.

10. Friendly Isle Auto Parts & Supplies, Inc. ("Friendly Isle Auto Parts"). Friendly Isle Auto Parts operates an auto parts supply store on Molokai. It has been in business for 22 years and has seven employees. Friendly Isle Auto Parts obtains 35-40% of its sales either from GE companies or their employees. If a moratorium on GE crops is imposed, Friendly Isle would lose virtually all of this business and would have no other source of business to replace it.

11. Plaintiff New Horizons Enterprise Incorporated dba Makoa Trucking & Services ("Makoa Trucking") operates on Molokai and provides trucking, hauling, forklift services, moving and logistical services, and freight-forwarding. It has been in business for 13 years and has eight employees. If the proposed ordinance is enacted, it will cause drastic and irreparable harm to Makoa Trucking's business. Makoa Trucking derives 30% of its business from the GM agriculture industry. If a moratorium on GM crops is

imposed, this portion of Makoa Trucking's business will vanish and there is no other source of business that could possibly replace it.

12. Plaintiff Hikiola Cooperative ("Cooperative") was formed in 1976 as a resource to provide Molokai families farming their homesteads access to affordable farming supplies. Cooperatives are unique organizations that operate on an at-cost basis and allow farmers to come together to purchase supplies, and process and market their products. Without the Cooperative, small farmers on Molokai would have a very difficult time cost effectively obtaining supplies for their farms. Plaintiffs Monsanto and Agrigenetics account for approximately 50% of the purchases through the Cooperative, and through their large purchases they effectively subsidize the remaining Cooperative members by allowing the Cooperative to acquire supplies on a bulk discounted basis. Without Monsanto's and Agrigenetics' large purchases, the Cooperative will face significantly increased costs that must be passed on to its remaining members.

13. Defendant County of Maui is a political subdivision of the State of Hawai`i. Its powers are governed by Article VIII of the Constitution of the State of Hawai`i and Hawai`i state laws,

including Hawai`i Revised Statutes Chapter 46. As a political subdivision of the State of Hawai`i, organized and operated under the laws of the State of Hawai`i, the County and its governing officials act under color of law.

## JURISDICTION AND VENUE

14.   This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1343(a)(3).

15.   This Court has jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a) because the claims that arise under Hawai`i law are so closely related to the claims which are otherwise within this Court's jurisdiction that they form part of the same case or controversy.

16.   Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (e) because the Ordinance will be enacted in, and is to be implemented in, this District.

## FACTS AND BACKGROUND INFORMATION

### Seed Industry In The County

17.   The seed industry began operating in Hawai`i in the 1960s and for over 50 years has been the fastest growing agricultural activity in the State. Today it provides 2,800 jobs

statewide, with about one-half billion dollars in total economic output (including multiplier effects). It is Hawai`i's single largest agricultural activity.

18. Because of its combination of temperature, sunlight, rain, predictable weather conditions, skilled workforce, and political stability due to its location within the United States, Hawai`i is an unparalleled location for highly specialized corn plant breeding, soybean breeding, and seed farming. Hawai`i's unique growing conditions permit more growing cycles per year than can be achieved in most other places, allowing seed companies to more rapidly develop new seed lines for the world market. In combination with modern breeding techniques, breeders on Maui and Molokai can quickly produce specialized seeds with the best genetics for each major growing region, while also maximizing yield, reducing disease, and producing many other benefits.

19. For these reasons, two of the nation's largest seed companies—Plaintiffs Monsanto and Agrigenetics—have established significant seed farming operations on both Maui and Molokai. These operations are responsible for more than 950 jobs in Maui County, and generate $84 million in economic output (including

multiplier effects).   The seed industry comprises as much as one-quarter of all Maui Country agricultural activity.   And on Molokai, the seed industry is the most significant private industry activity aside from tourism.

20.   There is no legitimate evidence (cited in the Ordinance or otherwise) that the Plaintiffs' seed farming operations have ever harmed any plant, person, or the environment.   Indeed, any such harm is implausible in light of the detailed regulatory regime applicable to these operations.

## GE Crops & Federal Regulatory Regime

21.   Over the past 20 years, farming GE crops has been a critical and generally accepted part of agriculture throughout the United States, including Hawai`i.   Some GE crops are engineered to tolerate specific herbicides, which increases yield by making weed control simpler and more efficient.   Other crops have been engineered to be resistant to specific plant diseases, insect pests, and drought.   These beneficial traits are hugely important to local, national and international agriculture.   For example, the development of a GE variety of papaya that is resistant to a virulent strain of the aphid-transmitted ringspot virus is widely credited

with saving the papaya industry in Hawai`i.

22.    Across the country, the vast majority of several major U.S. crops are now GE varieties, including 94% of all soybeans, 93% of all corn, and 96% of all cotton.  And 70-80% of foods eaten in the United States contain ingredients derived from GE crops. Not only have GE crops been deemed safe by expert federal agencies, but also multiple other governmental and non-governmental agencies have reached the same conclusions, including the U.S. National Academy of Sciences, the World Health Organization, the American Medical Association, the European Commission, and the British Medical Association.   Hundreds of peer-reviewed scientific studies and reports have documented the safety of GE crops.

23.    The federal government ensures the safety of GE crops through a detailed regulatory regime that coordinates the scientific safety standards of multiple federal statutes under the supervision of three expert federal agencies: the Food and Drug Administration ("FDA"), the Environmental Protection Agency ("EPA"), and the U.S. Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS").   New GE crops can only be tested

under the strict oversight of federal regulators who ensure the developmental crops could pose no genuine health or safety risk, and every GE crop on the market today was thoroughly evaluated through a multi-year scientific federal review process before it could be sold.

24.   The federal government created the "Coordinated Framework" in 1986 to provide a "coordinated and sensible regulatory review process" governing biotechnology in the United States that is "based upon the best available science." 49 Fed. Reg. 50,856, 50,856-57 (Dec. 31, 1984). The Coordinated Framework is founded on three federal statutes. Under those statutes, three federal agencies—FDA, EPA, and USDA's APHIS—have well-defined roles in the framework and exercise expert scientific judgment. Since its creation three decades ago, the framework has been formalized by regulation and affirmed by Congress.[4] To date, more than 100 GE crops have cleared the thorough federal review required by the Coordinated Framework. These are scientific

---

[4] In the years since the framework was created, Congress has amended or reauthorized each of the subject statutes, ratifying without change the Coordinated Framework's use of each of these authorities.

issues, and should not be political or partisan—dozens of GE crops have cleared federal review in each of the Clinton, Bush, and Obama Administrations. When a new GE crop does complete federal scientific review, the crop is deemed the same as its conventional counterpart for federal regulatory purposes. To understand the full scope of federal regulatory review requires a detailed overview of each of the USDA, EPA, and FDA processes.

*USDA/APHIS Regulation*

25. APHIS regulates GE crops pursuant to its authority under the Plant Protection Act ("PPA"). The PPA grants APHIS authority to regulate the "movement in interstate commerce" of all plant pests in the United States. 7 U.S.C. §§ 7711-12. In conferring this broad authority upon APHIS, Congress found that "all ... plants, plant products, articles capable of harboring plant pests ... are in or affect interstate commerce." 7 U.S.C. § 7701(9).

26. Pursuant to its plant pest authorities, APHIS promulgated a detailed regulatory scheme at 7 C.F.R. Part 340 governing GE crops. That regime deems organisms and products produced through genetic engineering which are plant pests or which there is reason to believe are plant pests as "regulated

article[s]," and prohibits their "release into the environment" without APHIS approval.   7 C.F.R. §§ 340.0(a), 340.1.   Because almost all GE crops use a bacterium (a plant pest) as a vector agent, new GE crops are generally treated as "regulated articles" until APHIS determines, based on a detailed scientific review, that the specific GE plant is unlikely to pose a "plant pest risk" greater than the non-GE plant from which it is derived.   *Id.* § 340.6(c).

27.   To complete its plant pest assessment, APHIS analyzes data from open-air field trials of the new GE crop and conducts an extensive scientific review of the plant.   *Id.*   APHIS's regulations establish a permit/notification regime for conducting these field trials, including specific provisions regarding where and how the GE material will be planted, *id.* § 340.3-.4, and the "processes, procedures, and safeguards" that will be used to contain the GE material, prevent cross-pollination with or gene flow to other plants, and ensure the crop's destruction at the conclusion of the trial, *id.* § 340.4(b)(10).   APHIS will review, approve, and modify the field trial "processes, procedures and safeguards", *i.e.* the trial's "design protocols," as appropriate for the particular type of crop.   The regulations set out a process for APHIS to *consult* during the review

process with the department of agriculture of the state (*not* county) in which the field trial is proposed to be conducted. But APHIS retains discretion to accept or reject the state's input or requests. *Id.* § 340.4(b), (c). Approved field trials are subject to ongoing inspections by APHIS, *id.* § 340.4(d), and APHIS requires a series of reports regarding the trials, *id.* § 340.4(f)(9).

28. If these field trials indicate that the new GE variety poses no plant pest risks, an individual may petition APHIS by presenting significant field trial data and other scientific support related to the health and safety of the plant for a determination of "nonregulated status." *See id.* § 340.6. APHIS generally considers these voluminous petitions for multiple years, publishes preliminary draft determinations, and considers public comments before reaching a final scientific conclusion. APHIS's action to deregulate a GE plant is a regulatory determination that the GE plant may be used in the United States in the same way as its conventional counterpart, including for commercial purposes. *See id.* § 340.6.

29. The PPA reflects a congressional determination that in some cases dangerous plants are a national problem that warrants a uniform, national solution. The PPA therefore expressly preempts

states and their political subdivisions from "regulat[ing] the movement in interstate commerce" of any "plant … [or] plant pest" "in order to control," "eradicate," or "prevent the introduction or dissemination" of a plant pest, if APHIS "has issued a regulation or order to prevent the dissemination of" the plant pest.   7 U.S.C. § 7756(b).   The PPA's express preemption clause contains two exceptions, neither of which has been triggered by the County.   *Id.* The first exception authorizes states and political subdivisions to regulate in the field of plant protection if those regulations are "consistent with and do not exceed" regulations issued by APHIS. *Id.* § 7756(b)(2)(A).   The second exception authorizes States and political subdivisions to regulate *if* they petition APHIS for permission and the Secretary agrees "that there is a special need for additional prohibitions or restrictions based on sound scientific data or a thorough risk assessment."   *Id.* § 7756(b)(2)(B).

30.   APHIS has repeatedly made clear that it considers state and local laws that impose requirements inconsistent with its GE regulations preempted.   *E.g.,* 57 Fed. Reg. 53,036, 53,040 (1992) ("This rule would preempt any State or local laws, regulations, or policies that are inconsistent with this rule.").   APHIS has explained

"that where the Secretary of Agriculture has established an interstate ... regulation ..., neither the States nor Territories can establish additional requirements concerning the particular subject matter regulated thereby" if those requirements are "different than, or otherwise inconsistent with, the provisions of the" federal rule. 58 Fed. Reg. 17,044, 17,053 (1992). The role of states is to consult with APHIS about "issues of state or local concern, *so that those issues will be directly considered as part of the Federal actions,*" not to enact conflicting local or state laws. *Id.* at 17,054 (emphasis added).

*EPA Regulation*

31.   EPA regulates GE crops in three ways, pursuant to its authority under the Federal Food, Drug, and Cosmetic Act ("FFDCA") and the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). First, under the FFDCA, EPA specifies the amount of pesticidal residue that may legally remain in or on foods. *See* 21 U.S.C. §346a. Second, under FIFRA, EPA must approve any pesticide before it may be marketed or used on *any* crop (GE or conventional, food or not) in the U.S. *See* 7 U.S.C. §§136a(c)(5), 136j(a)(1). EPA evaluates pesticides using a science-based review

process designed to ensure that the pesticide will not have "unreasonable adverse effects on the environment" or "human dietary risk." 7 U.S.C. §§136(bb), 136a. Third, some GE crops have been genetically modified to produce so-called "Plant-Incorporated Protectants" ("PIPs") to protect the plants from insect pests without the need for traditional pesticide applications. EPA has established a detailed regulatory regime, under FIFRA and the FFDCA, to govern the approval process for PIPs that is based on strict scientific standards and extensive input from academia, industry, other federal agencies, and the public. *See* 66 Fed. Reg. 37,772 (2001); *see generally* 40 C.F.R. Pts. 154, 174. EPA grants experimental-use permits for PIPs during the developmental stage of those crops to allow prospective registrants to generate the data EPA needs to evaluate new pesticide registrations.

### FDA Regulation

32. FDA has broad authority under the FFDCA to regulate the safety of food and food ingredients, including animal feed. 21 U.S.C. § 301 *et seq.* FDA regulates GE crops "[u]sing a science-based approach" to ensure that "foods and ingredients made from

genetically engineered plants ... are safe to eat."[5]   The agency has developed a premarket consultation process to assess whether foods derived from new GE crops are substantially equivalent to foods developed through traditional plant breeding.[6]   FDA's analysis includes considering whether the foods differ in toxicants, nutrient concentrations, or allergenicity.[7]   All GE crops on the market have cleared this FDA review.

*Other Federal Regulatory Programs*

33.   Other federal laws also address how farmers may market and sell various types of seed crops.[8]   Congress has, for instance, made a deliberate decision to regulate issues of genetic purity through labeling standards.   Under the Federal Seed Act, farmers may market their seed as "certified," "registered" or "foundation" seed if it meets specific standards for varietal purity (based on a lack of cross-pollination).   *See generally* 7 C.F.R. pt. 201.   Typically,

---

[5]   FDA, *FDA's Role in Regarding Safety of GE Foods,* http://www.fda.gov/forconsumers/consumerupdates/ucm352067. htm (last visited Nov. 6, 2014).
[6]   *See* 57 Fed. Reg. 22,984, 22,985 (1992).
[7]   *See id.* at 22,985-87.
[8]   "Seed crops" are crops grown to produce seed that farmers in turn plant to grow other crops.   Typically, "seed crops" only comprise a very small percentage of all crop acreage.

neighboring seed crop farmers who wish to sell genetically pure seed varieties work together to establish appropriate isolation distances between their crops to minimize cross-pollination.  USDA also administers the National Organic Program under the Organic Foods Production Act ("OFPA").  *See generally* 7 U.S.C. §§ 6501–22. Under that program, certified organic farmers cannot intentionally plant GE seed and then market the resulting crop as "organic."  So long as a certified organic producer follows necessary processes to minimize the potential for mixing with GE materials, an inadvertent trace of GE material in the organic product will not cause the organic producer to lose certification.[9]   Organic farmers are responsible for maintaining appropriate isolation distances from related GE crops to minimize cross-pollination; they charge a premium for their products specifically because they take additional measures of these sorts.

---

[9] National Organic Program, U.S. Department of Agriculture, *Genetically Modified Organism (GMO)* 10 (Jan. 2012), *available at* http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC 5096493
("The presence of detectable GMO residues alone in an organic seed does not constitute a violation of the NOP regulations.").

## Hawai`i's Regulation of Agriculture,<br>Farming, and Dangerous Plants

34.   It is a "declared policy of [Hawai`i] to 'foster attitudes and activities conducive to maintaining agriculture as a major sector of Hawaii`s economy.'"  HRS § 165-1.  And Hawai`i has deemed the promotion of "diversified agriculture" a vital public interest.  This principle is enshrined in the Constitution of Hawai`i, which expressly directs the State—not the counties—to conserve and protect agricultural and farming resources.  Article XI, § 3 of the Hawai`i Constitution provides:

> The State shall **conserve and protect agricultural lands, promote diversified agriculture**, increase agricultural self-sufficiency and **assure the availability of agriculturally suitable lands.**  The legislature shall provide standards and criteria to accomplish the foregoing.

Haw. Const. art. XI, § 3 (emphasis added).

35.   To effectuate that provision, the State Legislature has enacted a comprehensive statutory scheme governing agriculture through the State Planning Act, HRS ch. 226, and other statutes which delegated regulatory authority over this field to the Hawai`i Department of Agriculture ("HDOA").  *See* HRS tit. XI, chs. 141-169. Among other things, "[t]he department of agriculture shall be

headed by an executive board to be known as the board of agriculture," and that "[t]he board shall consist of ten members," including at least one resident of each county, HRS §26-16(a), thereby ensuring county representation in state agricultural policy.

36.   Through this comprehensive statewide regulatory scheme, the State regulates *both* plants that allegedly pose a danger to other plants and the environment *and* pesticides. *See* HRS §§ 141-2; 147-121; 149A; 150A-6.1(b); 150A-6.1(a); 150A-10; 152-1; 152-2; HAR §§ 4-68-6; 4-68-8.

37.   Through a comprehensive and exclusive statutory and regulatory regime, the State of Hawai`i regulates plants that allegedly pose a danger to other plants and the environment. Specifically:

- State law requires the HDOA to "adopt, amend, and repeal rules ... for and concerning: (1) The introduction ... and propagation of ... plants; (2) The quarantine, inspection, ... destruction, or exclusion ... of any ... seed ... or any other plant growth or plant product ... that is or may be in itself injurious, harmful, or detrimental to [the agricultural or horticultural industries or forests of the State]; ... [and] (6) The manner in which agricultural product promotion and research may be undertaken, after coordinating with the agribusiness development corporation." HRS §141-2.

- State law specifies that the HDOA "is designated as the official certifying agency for certifying seed concerning

genetic purity, identity, quality, and condition for the State." HRS §147-121.

- State law requires the HDOA to "designate, by rule, as restricted plants, specific plants that may be detrimental or potentially harmful to agriculture, horticulture, the environment, … or public health." HRS §150A-6.1(b).

- State law requires the Board of Agriculture within the HDOA to "maintain a list of restricted plants that require a permit for entry into the State," and specifies that "[r]estricted plants or any portion thereof shall not be imported into the State without a permit issued pursuant to rules." HRS §150A-6.1(a).

- State law provides for the Board to be assisted by "an advisory committee on plants and animals composed of the chairperson of the board …, the chairperson of the board of land and natural resources, the director of the office of environmental quality control, the director of the department of health …, and five other members, with expertise in plants, animals, or microorganisms, and who, by virtue of their vocation or avocation, also are thoroughly conversant with modern ecological principles and the variety of problems involved in the adequate protection of [the State's] natural resources." HRS §150A-10.

- State law authorizes the HDOA to designate, control, and eradicate "any plant species which is, or which may be likely to become, injurious, harmful, or deleterious to the agricultural … industry of the State and to forest and recreational areas and conservation districts of the State, as determined and designated by the department from time to time." HRS §§152-1, 152-2.

- HDOA regulations allow the agency to designate, control, and eradicate "(1) A plant species that is causing or has the potential of causing severe production losses or increased control costs to the agricultural, horticultural,

aquacultural, or livestock industries; or (2) A plant species that is or has the potential of endangering native flora and fauna by encroachment in forest and conservation areas; or (3) A plant species that is or has the potential of hampering the full utilization and enjoyment of recreational areas including forest and conservation areas; or (4) A plant species that is poisonous, injurious, or otherwise harmful to humans or animals." HAR §4-68-6.

- HDOA regulations also allow the agency to designate, control, and eradicate "[a] plant species that reproduces by seeds capable of being dispersed over wide areas," HAR §4-68-4, "[a] plant species that is capable of competing with cultivated crops for nutrients, water or sunlight," *id.* §4-68-5, and "[a] plant species that is not known to occur in one or more islands of the State," *id.* §4-68-8.

38. Likewise, there is a comprehensive state framework governing pesticides:

- The Hawai'i Pesticides Law assigns "the chairperson of the board of agriculture, in consultation with the advisory committee on pesticides and also with the approval of the director of health" the authority to "suspend, cancel, or restrict the use of certain pesticides or specific uses of certain pesticides when the usage is determined to have unreasonable adverse effects on the environment." HRS §149A-32.5.

- The HDOA "shall have the authority to carry out and effectuate" the purpose of the Pesticides Law by rulemaking including by: (1) establishing the "limitations and conditions for the application of pesticides by aircraft, power rigs, mist blowers, or other equipment;" (2) establishing, "as necessary, specific standards and guidelines which specify those conditions which constitute unreasonable adverse effects on the environment;" and (3) establishing "as necessary, record keeping requirements for pesticide use by applicators." HRS §149A-33.

- The Board has authority to adopt uniform rules to "establish a system of control over the distribution and use of certain pesticides." HRS §149A–19(a)(1).

- The HDOA is granted the authority to enter upon any public or private property to carry out inspections to carry out the purposes of chapter 149A. HRS §149A–36. And the HDOA is vested with the authority to levy administrative and criminal penalties for failure to adhere to the pesticide law. HRS §149A–41.

- The HDOA's regulations require that pesticides have labels containing "limitations or restrictions on use required to prevent unreasonable adverse effects on humans or the environment," including use "in or adjacent to certain areas." HAR §4-66-23.

- The HDOA "may, at any time, evaluate a licensed pesticide to carry out the provisions of the Act," and "shall investigate all reported events and information received that indicate that a licensed pesticide may have caused, or is likely to cause, unreasonable adverse effects to humans or the environment." HAR §4-66-32.1(a).

- The HDOA "shall evaluate a licensed pesticide when unreasonable adverse effects to humans or the environment have been documented and associated with the use of that pesticide." *Id.* §4–66–32.1(b). Among the triggers for such an investigation are "[p]ublic or worker health hazard," pesticides in water or in food, "fish or wildlife hazard," or "[t]oxicity to nontarget organisms." *Id.*

- The HDOA's evaluation of the licensed pesticide "shall consist of identification of unreasonable adverse effects to humans or the environment, including the social, economic, and environmental costs of the pesticide, identification of the uses of the licensed pesticide, identification of the benefits of the pesticide, identification of alternatives to the licensed

pesticide, identification of regulatory controls considered by the head in mitigating unreasonable adverse effects on humans or the environment, determination by the head as to whether the effects on humans or the environment are unreasonable, and recommendation by the head for regulatory actions." *Id.* §4-66-32.1(c).

- The HDOA's evaluation of a licensed pesticide "may lead to change, restriction of a use, refusal to renew a license, or cancellation or suspension of a license." *Id.*

39.   This Court concluded in *Syngenta Seeds, Inc. v. County of Kaua'i*, No. 14-CV-00014 BMK, 2014 WL 4216022 (D. Haw. Aug. 25, 2014) that the comprehensive state regime for pesticide and potentially dangerous plant regulation preempted the County of Kaua'i's attempt to regulate pesticides, establish buffer zones in which no crops could be grown  and require disclosure of the planting location of GE crops.

### Authority of Counties

40.   In Hawai'i, the authority of a county is derived from state law and the county's charter.

41.   Counties have no power to enact taxes, unless authorized by the Legislature.  Haw. Const. art. VIII, § 3 ("The taxing power shall be reserved to the State, except so much thereof as may be delegated by the legislature to the political subdivisions .....").

Neither the Constitution nor any law of the State authorizes a county to impose a tax on an individual private party to complete an environmental impact study.

42.   Counties may only impose a civil fine or penalty for "any violation of county ordinances or rules *after* reasonable notice and requests to correct or cease the violation have been made upon the violator." HRS § 46-1.5 (emphasis added).

### Maui County Charter

43.   The Maui County Charter ("Maui Charter") vests the legislative power of the County in the County Council. *See* Maui Charter § 3-6 (The "Council shall be the legislative body of the county."). It also provides that the "voters of the county shall have power to propose ordinances to the council," and that, "[i]f the council fails to adopt an ordinance so proposed without any change in substance, the voters may adopt the same at the polls, such power being known as the initiative power." Maui Charter § 11-1.

44.   The Charter vests the executive power in the Mayor. Maui Charter § 6-1.

45.   The Charter sets forth the precise and exclusive requirements for the repeal of an ordinance enacted via the

initiative power.    Section 11-8 provides that "[a]ny ordinances enacted pursuant to [the initiative power] may be amended or repealed by ordinance enacted after one (1) year from the date of certification" by "the affirmative vote of at least two-thirds of the council membership."   Nothing in the Charter allows an initiative to alter the Council's ability to amend or repeal an ordinance other than through the process set forth in the Charter.

46.   The Charter explicitly prohibits using the initiative power to "mak[e] or repeal[] any appropriation of money."   Maui Charter § 11-1(3).

47.   The Charter also prohibits an ordinance from carrying a penalty greater than $1,000 or 1 year in prison, or both.   *See* Maui Charter § 13-10 ("[N]o penalty shall exceed the amount of $1,000, or one (1) year's imprisonment, or both.").   Nothing in the Charter authorizes an ordinance to assess penalties of up to $50,000.

### The County of Maui Ordinance

48.   Section 5 of the Ordinance provides that "[I]t is unlawful for any person or entity to knowingly propagate, cultivate, raise, grow or test Genetically Engineered Organisms within the County of Maui."   The only exceptions to the ban are if the GE Organism is in

"mid-growth cycle" when the Ordinance is enacted, it is incorporated into food or medicine, it is used by a health practitioner to treat human patients, or it is used indoors by a university for non-commercial purposes. *Id.* The ban applies regardless of whether the federal government has approved a regulatory field trial or granted deregulation of a GE crop.

49.   The Ordinance provides that the ban "provided in Section 6" (sic.)[10]—inaccurately labeled a "Temporary Moratorium"—"shall remain in effect until amended or repealed by the Maui County Council as described in subsection 2." Ordinance §6.   Subsection 2 in turn provides that the Council "*may* consider proposed amendments to, or repeal of," the ban on growing GE crops contained in Section 6, but only if:

- "[A]n Environmental and Public Health Impacts Study (EPHIS) described in Section 7 has been completed for such GE Operation or Practice" and reviewed by the "County Council and citizens" as provided in Section 8.2a[11] after a "public hearing."

- "[A]t least two-thirds (2/3) of the council membership" vote to repeal or modify the ban.

---

[10] The ban is in Section 5, not 6.

[11] The Ordinance contains no Section 8.2a.  Nor is there any other section that establishes this review process.

- The County Council makes findings that the "GE Operation or Practice"—including planting and cultivating GE crops and applying pesticides for those crops— "does not result in significant harm," "will result in significant benefits to the health of present and future generations of Maui citizens," and "significantly supports the conservation and protection of Maui's natural beauty and all natural resources."

[Emphasis added.]

50. Any "[p]erson or entities affected by and seeking release from the ban" must pay for an EPHIS to be completed, regardless of the size or nature of the operation. Ordinance §7. The EPHIS must focus on "key environmental and public health questions related to *large-scale commercial agricultural entities* that engage in GE Operations and Practices and associated Pesticide use," regardless of whether the proposed use of GE crops is by a "large-scale commercial agricultural entit[y]." Ordinance §7(2).

51. Although the Ordinance does not provide cost estimates to complete an EPHIS, in concept the study appears similar to the sort of Environmental Impact Statement ("EIS") sometimes required under NEPA. A recent Government Accountability Office study looking at the available data demonstrates that an EIS typically costs millions of dollars.[12]

---

[12] http://gao.gov/assets/670/662546.pdf

33

52.   The EPHIS process will take at least two years to complete.[13]   It proceeds in two phases.   In phase one, the County Council must create and convene a "Joint Fact Finding Group" of "scientists and health experts free of GE industry ties" that is "facilitated by an independent and non-biased professional consultant."   Ordinance §7(3).   This group, whose affiliation with the County is unspecified, requests input from the public for 30 days regarding the scope and design of the EPHIS.   As to GE crops, the study must at a minimum evaluate the extent to which:

> • "Transgenic Contamination from GE Organisms to non-GE organisms may occur;"
>
> • "GE Organisms released into the environment may effectively be recalled from the environment;"
>
> • "Horizontal Gene Transfer from GE Organisms between organisms of different species may occur;"
>
> • "there is any correlation between birth defects and the proximity to extensive GE Operations and Practices occurring in Maui County **and Kauai County**."

Ordinance §7(3) (emphasis added).

53.   But despite the ban's focus on **GE crops**, the study

---

[13]   Ordinance §7(3),(4) (establishing up to 90 day process for convening Fact Finding Group, no limit on scoping process, requiring 30 days' public input, establishing up to 18 month study period—resulting in a likely 24 month process).

required to lift the ban requires extensive evaluation of the impact of **pesticides**, including at a minimum:

> • "Pesticides associated with GE Operations and Practices used both as single Pesticide and as Pesticide combinations may contaminate the groundwater, surface water, oceans and reefs;"

> • "Pesticide laden air and dust from GE Operations and Practices may be harmful to the people and Environment;"

> • "Pesticide combinations associated with GE Operations and Practices resulting from two or more Pesticides are applied at the same time or within their period of active life ("Pesticide Cocktails") have or have not been tested for safety and the extent to which they may be harmful to the people and Environment including but not limited to land, water, air, minerals, and energy resources."

Ordinance §7(3).

54. In phase two, a "non-biased professional consultant independent of GE industry ties with oversight by the [Joint Fact Finding Group]" must complete the EPHIS within 18 months, and then allow 90 days' of public comments including four public hearings. Ordinance §7(4). Any "relevant" public concerns must be addressed in the EPHIS. *Id.*

55. The purposes of the Ordinance are "to protect" and "preserve Maui County's Environment and Public Trust Resources," and "to protect Maui County from hazardous aspects of GE

operations and practices, including but not limited to increased Pesticide use." Ordinance §4.  Despite the ban's purported goal of studying GE crops, the Ordinance makes numerous unsupported and unscientific findings about the danger posed by GE crops and pesticides.  For example, the Ordinance claims that the "genetic engineering of plants and animals often causes unintended consequences" and could "produce results that lead to adverse health or environmental consequences," and explicitly declares that "GE Operations and Practice can have serious effects on the environment."  Ordinance §2(1),(4)-(5).  It makes no supported findings and cites no evidence that any of the GE crops it bans pose any such risks of environmental harm.  Nor does the Ordinance acknowledge, much less rebut, the contrary scientific findings of federal regulators based on years of field trials and scientific review.

56.  For every day a GE crop is planted in violation of the Ordinance, the person or entity violating the Ordinance shall be liable for $50,000 in penalties (except the first and second day, where the penalties are $10,000 and $25,000, respectively). Ordinance §9(2).  In addition, the Ordinance provides for criminal penalties including up one year imprisonment, a $2,000 fine, or

both for each day of violation.  Ordinance §9(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### PREEMPTION UNDER FEDERAL LAW

57.   Plaintiffs reallege and incorporate by reference herein all preceding paragraphs in this Complaint.

58.   The Supremacy Clause of the United States Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Under the Supremacy Clause, state and municipal laws that conflict with federal law are preempted and are thus without effect.  Preemption can be express, as when a federal law declares that it preempts state or municipal laws, or implied.  State or municipal laws are impliedly preempted whenever they conflict in their operation with federal law. Specifically, implied conflict preemption can arise when a municipal law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

59.   Through the PPA, FIFRA, the FDCA and its coordinated regulatory framework, the federal government regulates the

development, field testing, and commercial introduction of GE crops. Each crop is field tested under detailed USDA and/or EPA permitting processes before it can be commercialized. Following years of field trials, expert scientists at USDA, EPA, and FDA make specific scientific judgments regarding the GE crops. In short, none of the GE crops at issue here can be grown—either in a field trial or commercially—without prior federal government study, review, and authorization.

60. By enacting the Ordinance, the County of Maui has chosen to disregard and indeed specifically contradict the regulatory and scientific judgments of these federal agencies. Ignoring the specific controlling scientific determinations by the federal government, the County instead requires GE crop farmers to participate in duplicative studies and review that will take at least two years. And even if the EPHIS findings reveal a GE crop to be safe, the non-expert County Council still retains sole discretion to repeal the ban. The County does not base its multiple "concerns" on any scientific findings or evidence, but relies instead on the "precautionary principle"—postulating that the federal government must be incorrect in its scientific and regulatory judgments.

61.   The Ordinance thus regulates on matters specifically addressed by the detailed federal regime, expressly banning what federal law expressly allows.   It stands as an obstacle to the accomplishment and execution of the purposes of federal law to evaluate GE crops "based upon the best available science" and to treat them the same as their conventional counterparts when they pose no unique risks.   It stands as an obstacle to APHIS's and EPA's federal field trial regimes to evaluate new GE crops.   And as applied to field trials, it violates the PPA's express preemption clause.   The Ordinance's regulation of testing, cultivation, propagation, and development of GE crops in the County is expressly and/or impliedly preempted by federal law.

## SECOND CAUSE OF ACTION
## LACK OF AUTHORITY AND PREEMPTION UNDER STATE LAW

62.   Plaintiffs reallege and incorporate by reference herein all relevant preceding paragraphs in this Complaint.

63.   Section 50-15 of the Hawai`i Revised Statutes "expressly reserve[s] to the state legislature the power to enact all laws of general application through the State on matters of concern and interest ... and neither a charter nor ordinances adopted under a

charter shall be in conflict therewith."   And Section 46-1.5(13) further provides that a County is without power to enact ordinances "inconsistent with, or tending to defeat, the intent of any state statute where the statute … discloses an express or implied intent that the statute shall be exclusive or uniform throughout the State." Under this framework, a municipal ordinance will be preempted by state law if (i) "it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state," or (ii) "it conflicts with state law."   *Richardson v. City & Cnty. of Honolulu*, 76 Haw. 46, 62 (1994).

64.   The Hawai`i Constitution makes it the duty of the State to "conserve and protect agricultural lands, promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of agriculturally suitable lands."   Haw. Const. art. XI, § 3.   The Legislature has fulfilled this obligation, by enacting a series of statutes to protect and preserve agricultural and farming resources of the State, including the Hawai`i Pesticides Law.

65.   The Legislature has also delegated rulemaking authority to the Department of Agriculture in several areas related to

agriculture in Hawai`i, including: (1) regulation of pesticide use, *see* HRS §§ 149A-31 to −37; (2) certification of seed genetic purity, identity, and quality, *see* HRS § 147-121; (3) introduction, quarantine, or exclusion of plants designated by the HDOA as "detrimental or potentially harmful to agriculture, horticulture, the environment, or animal or public health," *see* HRS §§ 141-2, 150A-6.1; and (4) designation, control, and eradication of "noxious weeds." *See* HRS ch. 152.

66.  As described in detail above, the State comprehensively and exclusively regulates the field of pesticides and potentially dangerous plants.

67.  The County has no authority under the Hawai`i Constitution and applicable state statutes to enact or enforce the Ordinance.

68.  And the Ordinance conflicts with the Hawai`i Right to Farm Act (HRS ch. 165), by effectively declaring the farming of GE crops a public nuisance when such farming is actually a generally accepted agricultural practice.

69.  Rather than "promote diversified agriculture, increase agricultural self-sufficiency and assure the availability of

agriculturally suitable lands," Haw. Const. art. XI, § 3, the Ordinance imposes severe restrictions on GE crops within the County purportedly to "to protect [the] County from hazardous aspects of GE [o]perations and [p]ractices." Ordinance § 4(3). In essence, the Ordinance prohibits all GE farming operations, despite the fact that such farming has been a generally accepted agricultural practice in the County for decades and the fact that the legislature has clearly intended that the state scheme for the regulation of potentially harmful plants and pesticides "be both uniform and exclusive." The Ordinance is therefore preempted under state law, because it covers the same subject matter embraced within a comprehensive state statutory scheme and conflicts with Hawai`i state law.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE COMMERCE CLAUSE
### OF THE U.S. CONSTITUTION

70.   Plaintiffs reallege and incorporate by reference herein all relevant preceding paragraphs in this Complaint.

71.   The Commerce Clause gives Congress the power "to regulate Commerce … among the several states." U.S. Const., Art. I, § 8, cl. 3. The Supreme Court has found in this grant of power an

implicit "dormant" form that "significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce." *Maine v. Taylor*, 477 U.S. 131, 151 (1986).

72.   The Ordinance unconstitutionally impedes interstate commerce in GE crops by prohibiting the planting of all new GE crops and disrupting the international and national supply of seeds. There is no sufficient local justification for the burden imposed on interstate commerce.

## FOURTH CAUSE OF ACTION
## INVALIDITY UNDER THE COUNTY CHARTER & STATE LAW

73.   Plaintiffs reallege and incorporate by reference herein all relevant preceding paragraphs in this Complaint.

74.   The Ordinance conflicts with the Maui Charter and state law in numerous respects.  The offending portions of the Ordinance cannot be severed, rendering the Ordinance entirely invalid.

75.   The Maui County Charter provides that the maximum penalty for violating an ordinance is $1000, Maui Charter § 13-10, and state law provides that no fine or penalty can be imposed without first providing notice and an opportunity to correct the violation, HRS § 46-1.5(24)(A).   Yet the Ordinance imposes

43

fines/penalties ranging from $10,000 to $50,000 for each violation, and fails to provide any right to a hearing, any prior notice, or any opportunity for an alleged violator to take corrective action. Ordinance § 9(2). The Ordinance contains an invalid fine/penalty under the Charter and state law.

76. The Maui Counter Charter provides that the County Council can repeal an ordinance passed by initiative after one year and by two-thirds vote of the council membership. Maui Charter § 11-8. Yet by its terms the Ordinance cannot be repealed for at least two years, and in addition to a vote the Ordinance requires the County Council to complete an EPHIS process and make numerous "findings" before the Ordinance can be modified or repealed. The Ordinance improperly modifies and limits the County Council's repeal powers under section 11-8 of the Charter.

77. The Charter explicitly prohibits using the initiative power to "mak[e] or repeal[] any appropriation of money." Maui Charter § 11-1(3). Yet the Ordinance imposes an invalid tax/fee on any person or entity seeking to use GE crops, and then appropriates the use of that money to fund an extensive environmental impact study. The Ordinance improperly appropriates in violation of section 11-

1(3) of the Charter.

78.   Art. VIII, § 3 of the Hawaii Constitution reserves the taxing power to the State unless delegated to the County.   The Ordinance's requirement that a person or entity seeking to use GE crops individually fund an environmental study is a tax.   Ordinance §7(1).   But the Legislature has not authorized the County to impose such a tax.   Nor does the Charter purport to authorize such a tax. The Ordinance improperly imposes a tax in violation of state and county law.

79.   Article 7 of the Charter provides that the Mayor of Maui, as the executive of the County, shall enforce all County ordinances and all applicable County laws.   Maui Charter § 7-5(17). And it empowers the Department of Environmental Management and its director to supervise "control of pollution, including . . . protection of the unique beauty of Maui county," and "[g]uide efforts to optimize opportunities for environmental, natural resource protection, sustainability, conservation, and restoration."   *Id.* 8-15.3.1, .4.

80.   Instead of providing the executive branch with the duty to carry out the EPHIS, the Ordinance provides that the County

Council shall create and convene a Joint Fact Finding Group to determine the scope and design of the EPHIS.   Ordinance § 7(3). The Ordinance further calls for the EPHIS to be conducted by a consultant overseen by the Joint Fact Finding Group.   Ordinance § 7(4)   The Ordinance's placement of the EPHIS process with the Joint Fact Finding Group, which is to be created and convened by the County Council, the legislative body of the County, violates the separation of powers required by the County Charter.

## REMEDIES

## DECLARATORY RELIEF

81.   Plaintiffs reallege and incorporate by reference herein all relevant preceding paragraphs in this Complaint.

82.   Plaintiffs seek declaratory relief pursuant to 28 U.S.C. § 2201, and for further necessary and proper relief pursuant to 28 U.S.C. § 2202.

83.   There is a real, present, and genuine dispute between Plaintiffs and Defendant regarding Plaintiffs' rights and remedies under the Ordinance, and under the Constitutions and laws of the United States and the State of Hawai'i, as alleged above, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.  There is uncertainty about the legality of the Ordinance and Plaintiffs' alleged obligations thereunder.  The uncertainty is disrupting Plaintiffs' operations and causing them substantial expense.

84.   Plaintiffs are entitled to a declaratory ruling establishing that the Ordinance is illegal and invalid, as alleged herein.

## INJUNCTIVE RELIEF

85.   Plaintiffs reallege and incorporate by reference herein all relevant preceding paragraphs in this Complaint.

86.   Plaintiffs seek a temporary restraining order, and preliminary and permanent injunctive relief pursuant to this Court's general jurisdiction and the applicable portions of Title 28 of the United States Code.

87.   The Ordinance violates the Constitutions and applicable laws of the United States and the State of Hawai`i, as alleged herein.

88.   If the County is permitted to enforce the Ordinance, Plaintiffs will suffer immediate and irreparable injuries, including: (1) substantial disruption to product development and research; (2) elimination of a unique growing environment that provides

competitive advantage; (3) loss of livelihood; (4) harm to the reputation and goodwill of Plaintiffs; (5) significant impairment to land and plant equipment; and (6) the violation of their constitutional rights.

WHEREFORE, Plaintiffs pray that this Court:

A.     Take jurisdiction over the parties and this cause;

B.     Enter a judgment declaring the Ordinance to be invalid under the laws of the United States and the State of Hawai`i;

C.     Enter a temporary restraining order and preliminary and permanent injunctions enjoining the County and its agents and employees from enforcing the Ordinance against Plaintiffs or any commercial agricultural company or similarly situated business; and

//

//

//

//

//

//

D.     Grant Plaintiffs all other relief in law and in equity to which they may be entitled.

DATED: Honolulu, Hawai'i, November 13, 2014.

Respectfully submitted,

MARGERY S. BRONSTER
REX Y. FUJICHAKU
DONNA C. MARRON

Attorneys for Plaintiffs
ROBERT ITO FARM, INC.; HAWAII
FARM BUREAU FEDERATION,
MAUI COUNTY; MOLOKAI
CHAMBER OF COMMERCE; and
AGRIGENETICS, INC.

KENNETH S. ROBBINS
PAUL ALSTON
JAMES BLAINE ROGERS III
NICKOLAS A. KACPROWSKI
MICHELLE N. COMEAU
PHILIP PERRY *(pro hac vice pending)*
ANDREW D. PRINS
*(pro hac vice pending)*

Attorneys for Plaintiffs
MONSANTO COMPANY;
CONCERNED CITIZENS OF
MOLOKAI AND MAUI; FRIENDLY
ISLE AUTO PARTS & SUPPLIES,
INC.; NEW HORIZON
ENTERPRISES, INC. dba MAKOA
TRUCKING AND SERVICES and
HIKIOLA COOPERATIVE